THOMPSON, Respondent, v. HART, Administrator, et al, Appellants.

(167 N. W. 161.)

(File No. 4125.   Opinion filed March 26, 1918.   Rehearing denied June 1, 1918.)

1.   Mortgages—Foreclosure—Defense,   Use   as .  Homestead—Non-homestead Recital, Effect As Declaration.

In a suit to foreclose a realty mortgage, the defense being that the property was the family homestead, and that mortgage was not concurred by mortgagor's wife, held, that a recital in the mortgage to the effect that the premises "have never been used or occupied as a homestead by the grantor or any member of his family, nor are they at the present time so used or occupied," was intended as and was a declaration by mortgagor that the premises were not then impressed with homestead character.

2.   Same—Foreclosure—Mortgage Recital of Non-homestead Character of Realty—Ignoring Recital, Fraud on Mortgagee By.

In a suit to foreclose a realty mortgage, the defense being that the property was the family homestead and that mortgage was not concurred in by mortgagor's wife, held, that to ignore a recital in the mortgage to the effect that the property was not and had not been occupied as a homestead by grantor or family, would amount to a fraud on the mortgagee.

3.   Homestead—Mortgage Foreclosure—Defense of Family Homestead, Wife's Non-concurrence—Wife's Intention, Evidence, Sufficiency.

Where, in a suit to foreclose a realty mortgage, the interest represented by mortgagor's deceased wife interposed the defense that the property was the family homestead and that mortgagor's wife did not concur in the mortgage, held, that

evidence of statements made by both mortgagor and his wife, showed that prior to mortgagor's death both husband and wife intended that another piece of realty owned by the wife, which was free from debt, should be selected as a homestead, which intent was carried out by the wife after husband's death when, with the family, she removed to and occupied said other property as her home; that such election cannot be changed by those now claiming as heirs of the mortgaged estate. **Held,** further, that notwithstanding evidence of many declarations by mortgagor, tending to show he regarded a new house in course of construction when mortgage was executed, as his homestead, trial court did not err in determining that the mortgaged premises were not then the family homestead.

4. **Evidence—Homestead, as Defense to Mortgage Foreclosure on Wife's Interest—Wife's Subsequent Statements, Effect re Validity of Mortgage.**

    While the statements of the wife of a mortgagor of realty, made subsequent to giving of the mortgage, would not make a void mortgage valid, yet such statements, to the general effect that subsequently to the execution of the mortgage and of her husband's death, she with the family, removed to and occupied another property of her own as her home, are convincing evidence that the latter place, occupied by herself and family, was in fact their homestead, and that the newly erected and heavily incumbered house standing upon the mortgaged premises, was not their homestead.

5. **Attorneys—Professional Conduct—Testimony of, re Merits of Client's Cause—Bar Association Code of Professional Ethics— Cautionary Suggestion.**

    In view of the record on appeal before the Supreme Court, involving lengthy testimony by an attorney concerning the merits of a client's cause on trial, attention of the State Bar is drawn by the Court to Sec. 19, Code of Professional Ethics, as adopted by American Bar Association, and by South Dakota State Bar Association; same relating to and laying down ethical rules which should govern counsel in giving, and in refraining from giving testimony concerning merits of the client's cause on trial.

    Whiting, P. J., and McCoy, J., dissenting.

Appeal from Circuit Court, Clay County. Hon. Robert B. Tripp, Judge.

Action by M. D. Thompson, against Edward M. Hart, as administrator of the estate of Erick Nylen, deceased, P. J. Bowman administrator of the estate of Christina Nylen, deceased, and others, to foreclose a mortgage on realty. From a judgment
19—Vol. 40, S. D.

for plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

*Bogue & Bogue,* for Appellants.

*Payne & Olson,* for Respondent.

(2)   To point two of the opinion, Respondent cited: Jensen v. Griffin, (S. D.) 144 N. W. 119, 50 L. R. A. N. S. 1128; Waples' Homestead and Exemption, p. 392.

(3)   To point three of the opinion, Appellants cited: Clark v. Evans, 6 S. D. 244; Kingman v. O'Callaghan, 4 S. D. 628; Gallagher v. Keller, 87 Tex. 472, 29 S. W. 647.

GATES, J.   Action to foreclose a real estate mortgage. Defense: That the property was the family homestead and the mortgage was not concurred in by the mortgagor's wife. Judgment awarding foreclosure. From the judgment and an order denying a new trial, defendants appeal.

The mortgage was given in January, 1915, at which time a dwelling house was in process of erection upon the premises by Mr. Nylen, the mortgagor. The premises were not occupied until May, 1915, when Nylen and his family moved in.   Nylen died in August, 1915, but the family continued to occupy the premises until about October 1, 1915, when they removed to the premises hereinafter referred to as the cottage.   Mrs. Nylen died in December, 1915.   The mortgage contained the following provision:

"The above-described premises have never been used or occupied as a homestead by the grantor or any member of his family, nor are they at the present time so used or occupied."

[1, 2]   That recital was clearly intended to be and was a declaration by Mr. Nylen that the mortgaged premises were not then impressed with the homestead character.   Granting that but for that provision there is ample evidence in the record to justify a finding, if the court had so found, that it was the intention of Mr. Nylen to use the premises as a homestead when the building should be completed, it would, so far as he is concerned, amount to a fraud on the mortgagee to allow that provision of the mortgage to be ignored.

[3]   Granting that such provision was not binding upon the owner's wife, let us see what her intention was.   Peter Olson, one of plaintiff's attorneys, furnished the principal evidence on that subject.   Mrs. Nylen was and had been for years the owner

of a home, referred to as the cottage. After the death of Mr. Nylen she moved from the mortgaged property to this cottage and remained there until her death. Mr. Olson testified as follows:

"I had a conversation with Mrs. Nylen relative to this property on or about the 19th day of December, 1914, during the time when this house was under construction, at our office. She told me that Mr. Barton, of the Thompson Lumber Company, had declined to give Mr. Nylen further credit, and she was crying, and she stated that they were so heavily in debt that they owed all over town; that she was ashamed to go down town; that Mr. Nylen was very careless about his business, and that he would receive statements and would throw them on his desk and they wouldn't be opened, and that he had several checks upon his desk that he failed to cash; and that she was becoming very much concerned about him. She stated that she wanted him to sell all of his properties, and apply the proceeds of the sales in payment of the debts and to satisfy the creditors. I had a conversation with Mrs. Nylen on the 29th day of November, 1915, at her home. I was there at her home. That is the property which was in her name, where she lived at the time of her death. That is the cottage referred to. I was there on professional business about 12 days before her death, and this conversation occurred while I was there on professional business. I was there on behalf of John Hanson, and I talked with Mrs. Nylen about John Hanson's business, and was not there as an attorney for Mrs. Nylen, and was not consulted by her in any way. I called on Mrs. Nylen and told her that I had been sent to her at the request of Mr. Hanson and informed her that he had a claim against the property involved in this action for wages and material that he had furnished in the construction of the house, and I told her that the time was about to expire, and that if he was going to enforce the lien that he would have to begin his action, but that before he began the action that he wanted me to see her and ask her if she wouldn't pay it, and I told her that, and she stated that she did not want to pay it; stated that she wanted Mr. Hanson to have the money but that he would have to foreclose his mechanic's lien, that there was already a mortgage on the property, and that the mortgage was held by Mr. Thompson,

and that Mr. Hanson and Mr. Thompson would have to fight it out among themselves, as to whether or not the lien would be established. She stated that she would make no defense whatever. She stated that she would make no claim against the other property; that she would make no redemption from the mortgage; that the mortgages were so big that it was all that the property was worth, and then she went on to relate that she and Mr. Nylen had always understood that this was to be their home in case of an emergency of that sort, and that she had moved to that home and was satisfied with that and other property she had. She stated the property where she was living was to be her home. She stated in that conversation that they should have moved to that place in the first place; that she was never contented at the new home; that they did not have enough to furnish it."

Testimony offered on behalf of plaintiff revealed the following facts: About the time the mortgage was given Nylen offered to exchange his house for one owned by Mr. Vanneman, and he offered to rent it to Vanneman. A little later, in response to an inquiry from Vanneman as to whether he would rent it to Mr. Colton, Nylen said he was uncertain whether he would rent it or not. Mr. Barton testified that as an officer of the Thompson Lumber Company he had sold material to Nylen for the construction of this house with the agreement that the house was to be sold when he had an opportunity and the proceeds applied upon the debt. He further testified that Nylen told him, about the time Nylen moved into the house, that it was for sale, and that at any time he could sell it he would move out; that in 1914, when Nylen wanted further credit, he told witness that "the only property that was considered as a homestead, that is considered exempt, that he would not trade in, was the house that she bought in her name—[the cottage]." Witness further testified that in August, 1914, Mr. Nylen stated that (the cottage) was to be the homestead, and he considered it the only homestead, that is, the only property that he would not sell or trade; the other properties were to be considered his assets on the strength of these other properties he wanted credit; that the credit thereby obtained was later paid out of the proceeds of the mortgage in suit. Wit-

ness further said that in October, 1914, he heard Nylen say
that (the cottage) was his homestead.

Mr. Anderson testified:

"During the month of January, 1915, I had some talk with
Mr. Nylen regarding negotiation of a loan from Mr. Thompson.
In negotiating that loan he executed three mortgages, I believe
—four. He made a loan then from Mr. Thompson. I pre-
pared the mortgages. Exhibit A which you now show me is one
of the mortgages I prepared. I had a conversation with Mr.
Nylen at the time as to what properties he owned,
and as to what property he claimed as his homestead. I
called Mr. Nylen into the bank to get a settlement from him for
amounts that he owed to the Thompson Lumber Company, the
Thompson-Lewis Company, and to the D. M. Inman Company,
in order to find out what I could take as security. I had to ask
him what properties he owned, and what I could include in the
mortgages. He owned at that time the building next to the
bank, the house; that Mr. Vanneman lives in, the house that was
then under construction south of the Vanneman house, and an
interest in the building now occupied by the Ketchum garage,
and besides these properties I knew they owned the cottage. I
don't know where it is located or anything about that, but I knew
they owned the house that John Nylen was living in at that
time. I asked Mr. Nylen if that could be included, and he said
that was in his wife's name, and couldn't be included, because it
was their homestead, but the other properties could be included
in the mortgage, and I took mortgage on the other properties for
M. D. Thompson. Mr. Nylen asked if we wouldn't take the
properties and sell them. He used that expression to 'sell' them
for him and apply it toward his indebtedness, or have me see
Mr. Thompson and have him take the properties."

Mr. Hart testified:

"I have had conversations with Mr. Nylen regarding what
property he claimed as his homestead in Vermillion. * * * In the
conversation had during the fall of 1914 he asked me if I could
find him a buyer for these properties. He did not claim any
right in this particular property involved in this action as a
homestead. The conversation was that they owned the cottage
and considered that a property on which they could fall back in·

case reverses came to him or the family. * * * I asked him if he cared to sell that property which was in the name of Mrs. Nylen, and he did not give me a definite answer. I asked him if $3,000 would buy it, and he gave me rather an evasive answer on that, and I asked him what would buy it, and he said he would let me know. He came in perhaps a day or two afterward, and said that he did not care to sell that property; that he and his family had talked it over and they intended to keep that; the balance of it he would sell. He said something might happen to him, and 'I want a home where the family can go back and be taken care of.' * * * In using the word 'homestead' Mrs. Nylen said she had the home that they could go back to. That was after Mr. Nylen's death and before I was appointed administrator of his estate. It was right after the death of Mr. Nylen. From the conversation I gathered that she understood the mortgage covered the four properties, but not her own home. She hoped the properties would sell for enough to satisfy the indebtedness. At the time we had this conversation after the death of Mr. Nylen nothing was said except that she had that home to go back to. After I was appointed administrator she called at the bank and said that she thought she would go back to the cottage; that the house was larger than they needed, and that it would be much more economical to live in the cottage. She at that time repeated that statement; that she hoped the properties covered by the mortgages would satisfy her indebtedness in full."

From the statements made by both Mr. and Mrs. Nylen as shown by the evidence, it seems clear that prior to his death both had in mind and intended that the cottage which was free from debt should be selected as the homestead, and that this intent was carried out by her after the husband's death, when, with the family, she removed to and occupied the cottage as her home. That election should not be permitted to be changed by those who are now claiming as heirs of the estate.

[4] In spite of the evidence offered in behalf of defend-ants as to many declarations made by Mr. Nylen to workmen, friends, and acquaintances, tending to show that he regarded the new house as his homestead, we are unable to conclude that the trial court erred in its determination that the premises in suit were not the family homestead at the time the mortgage

was given. While it is true that the statements of Mrs. Nylen made subsequent to the giving of the mortgage would not make a void mortgage valid, yet such statements are convincing evidence that her own cottage, owned and occupied by herself and family, was in fact their homestead, and that the newly erected and heavily incumbered house was not their homestead.

[5]   In view of the record in this case, we deem it an opportune and fitting occasion to call the attention of the members of the bar of this state to section 19 of the Code of Professional Ethics as adopted by the American Bar Association, and by the South Dakota State Bar Association.  See, also, Costigan on Legal Ethics, 448, 297, note; 1 Mod. Am. Law, 33.  We do not wish to be understood as intimating that there is any general disregard of this section by the bar of this state; but it nevertheless has been disclosed in a few cases that counsel have failed to comply with its very salutary provisions.

The judgment and order appealed from are affirmed.

WHITING, P. J., and McCOY, J. (dissenting).  We are unable to concur in the majority opinion.  Erick Nylen, the mortgagor, was a contractor and builder, and erected many buildings at Vermillion, among them being several dwelling houses built for himself. About the year 1900 he built the little house which always stood in his wife's name, the house in which she died, and which, under respondent's theory, was at the time of the giving of the mortgage in suit the homestead of Nylen and wife. The Nylens lived in this property until about 1906 or 1907, when he built another house into which he moved with his family and where he lived until the fall of 1914. He then sold this property, and the evidence shows, absolutely without any contradiction that, at the time of such sale, he intended to construct another home.  He even asked to and did leave some of the furniture in the house that he sold until he built the new house.  He commenced the new house within a week or two.  He moved his family temporarily into an old courthouse building that did not belong to him.  At that time he owned a dwelling house which he was renting.  Adjacent to the lot on which this house was situate was a vacant lot also owned by Nylen.  He decided to build his new home on this vacant lot and proceeded to construct same.  That he intended this house as the dwelling house

for himself and family is absolutely undisputed. The several rooms in this house, as is conclusively shown by the testimony of a large number of disinterested witnesses, and as is disputed by no witness, were planned to meet the tastes of those members of his family who were to occupy them. As fast as he got rooms finished he moved household goods in. It was while this home was being constructed, and with the mortgagee knowing that the former home had been sold, and that Nylen was living in the courthouse building, that this mortgage was taken. There is no pretext on the part of respondent that he did not know this house was to be occupied by Nylen and family as their home; he merely testified that at the time he took the mortgage he did not know that they "made any claim of homestead right in the property." This mortgagee does not claim that he supposed the property that stood in the wife's name was their homestead. But in an attempt to uphold his mortgage the mortgagee offered the testimony of other witnesses to show—what? Not that this dwelling house was not being erected for a home for Nylen and family, but to show that, regardless of the fact that this dwelling house was being built as a home for his family, yet, as a matter of fact, this little place where this family lived away back years before was the "homestead" of this family. We have searched the record in vain for the testimony of any witness that tends in the remotest degree to prove any further than that this piece of property, standing in his wife's name, Nylen intended to keep clear of liens and incumbrances in contemplation that at some time in the future adversity might overtake him and there would still be a place to which his family could go for a home. As the administrator, testifying for plaintiff, said in regard to what Nylen advised him:

"They owned the cottage and considered that a property to which they could fall back in case reverses came to him or the family."

There is not one syllable of testimony to show that Nylen or any member of his family ever expected to or ever did return to this property under any other circumstances. Under the evidence, it would be preposterous to claim that the place, which was the home of this family from 1906 or 1907 down to the fall of 1914, was not the "homestead" of this family. That being true, it

well may be asked: When did Nylen and wife ever reinvest her property with the "homestead" character? There is nothing in the evidence quoted or in any other evidence in the record that shows or even tends to show that it was ever reinvested with such character.

There is much in Olson's testimony to show that this widow was ignorant of her legal rights, and that she was willing to allow this property to be taken on the mortgage, and the claimed lien, but even if it were to be conceded that she knew the mortgage to be void and knowing that had expressed an expectation, or even a willingness, that this property should go to pay the mortgage and lien, no such expectation, no willingness, not even a desire on her part that this property should be used for such purpose, could make this mortgage a valid and enforceable contract as against her, say nothing of such expectation, willingness, or desire on her part making it valid and enforceable as against her children.

We concur with our Colleagues in calling attention to section 19 of the Code of Professional Ethics.